## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| ENZA MACRI, | : | |
| | : | **CIVIL ACTION NO.:** |
| **Plaintiff,** | : | |
| | : | **3:22-cv-00754 (    )** |
| v. | : | |
| | : | |
| **MIDDLETOWN BOARD OF** | : | |
| **EDUCATION,** | : | |
| **THE CITY OF MIDDLETOWN,** | : | |
| and **MICHAEL T. CONNER,** | : | |
| in his individual capacity, | : | |
| | : | |
| **Defendants.** | : | **June 8, 2022** |
| | : | |

## COMPLAINT

### I.  INTRODUCTION

1.  Middletown Public Schools and the Middletown Board of Education knew that their Superintendent of Schools, defendant Dr. Michael Conner, was repeatedly subjecting their Associate Superintendent of Schools, plaintiff Dr. Enza Macri, to sexual harassment and outright sexual assault.  Yet they took no action to protect her.  As a result, Dr. Macri suffered from such severe mental and physical distress that she had no choice but to leave the job and community she loved in order to escape the abuse.

### II.  JURISDICTION AND VENUE

2.  The Court has subject matter jurisdiction over this action under 28 U.S.C. § 1331.

3.  Venue is proper in this District under 28 U.S.C. § 1391(b)(2), because the events or omissions giving rise to the asserted claims occurred herein.

4.   This Court has supplemental jurisdiction over the plaintiff's state law claims, pursuant to 28 U.S.C. § 1367, because they form part of the same case or controversy as the federal law claims.

### III.   PARTIES

5.   The plaintiff, Enza Macri, resides in Connecticut.

6.   Enza Macri is female.

7.   Dr. Macri demands a jury trial on all claims so triable.

8.   Defendant Middletown Board of Education is a duly organized Board existing under the laws of the State of Connecticut, charged with operating the Middletown Public Schools, a public school district located in Middletown, Connecticut

9.   Defendant City of Middletown is a municipality and political subdivision of the State of Connecticut.

10.   Defendant Michael Conner was the Superintendent of Schools employed by the Defendant Middletown Board of Education and/or the City of Middletown during all relevant times herein.

11.   At all relevant times, Dr. Macri was the Associate Superintendent of Schools for the Middletown Public Schools.

12.   As operated by the Defendant Middletown Board of Education, Middletown Public Schools is an education program or activity that receives federal financial assistance within the meaning of Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681.

IV.     **STATEMENT OF FACTS**

13.   Dr. Macri started working for Middletown Public Schools (MPS) in 2005. From then on, MPS was not only a place for Dr. Macri to work. It was also her second family and the cause to which she committed her life.

14.   In November of 2017, Dr. Michael Conner was named the next Superintendent of Schools for MPS. Dr. Macri was thrilled at the prospect of working with Dr. Conner.  She thought he had innovative ideas – including ways to close the achievement gap and to secure additional district funding for the district – and she was excited to partner with him to implement them. Dr. Macri also believed that having a person of color leading the district would play an important role in promoting equity in education.

A.     **Dr. Conner Quickly Displays Hostility Towards Women.**

15.   Unfortunately, within the first few weeks of his employment, Dr. Conner revealed how he viewed women, particularly women of status and authority within MPS.

16.   On numerous separate occasions, Dr. Macri witnessed Dr. Conner yell at several different female administrators without justification. After Dr. Conner's outbursts, Dr. Macri was left in the untenable position of trying to undo the harm Dr. Conner caused.

17.   Dr. Conner referred to female MPS administrators as "Dr. Macri's administrators," implying that they did not work with him but only with her.  If the administrators did not praise Dr. Conner, he told Dr. Macri that they were racist.

18.  Dr. Conner frequently referred to female staff member as "girls." For example, he would tell Dr. Macri that she needed to "talk to her girl" or tell "her girl" something. Dr. Conner did not refer to any male staff members as "boys" or other juvenile terms.

19.   Dr. Conner also made comments about female staff members' appearances and tied their looks to their continued employment. For example, in referencing one of those members, Dr. Conner told Dr. Macri that he "did not like her face" and that she needed to "fix it" if she wanted to continue to work in MPS.

20.   Approximately ten female administrators and eight male administrators worked in the district. Dr. Conner treated the women disproportionately poorly. For example, if a problem at a male administrator's school came to Dr. Conner's attention, Dr. Conner would give him a handshake and tell him "not to worry about it, bro." But if a female administrator had a problem at her school, Dr. Conner would become enraged and would publicly berate the female administrator for allowing the problem to escalate to his level.

21.   Dr. Conner told Dr. Macri he did not like one specific female administrator (hereinafter the "Administrator") because he believed the Administrator thought she was smarter than he.  He appeared to derive pleasure in publicly shaming the Administrator. For example, Dr. Conner called Dr. Macri into his office and told her to sit down and "listen to this." He then called the Administrator and berated her for seemingly no reason. During his tirade, Dr. Conner laughed and stared at Dr. Macri, appearing to enjoy the audience for his abuse of a high-ranking, professional woman. When Dr. Conner hung up the phone, Dr. Macri questioned why he treated the Administrator so harshly. Dr. Conner replied that he did not like the Administrator's "face and attitude," so he was going to "show her who was the boss."

22.   Dr. Conner would use whatever tactics necessary to promote himself nationally, even at the expense of the female administrators on his team. In one case, Dr. Conner told Dr. Macri to work with her "girls" because he heard from "national networks" that they are "not on board" with his "strategic plan" and were planning to sabotage it.

23.   Later, Dr. Conner summoned Dr. Macri to his office and ordered her to get herself and her "girls" on board with his plan. Dr. Conner stated that it took years to get noticed by national vendors and now that he was Superintendent, he intended to work with them, and one day be nationally recognized himself. He then told Dr. Macri: "no one is going to ruin my opportunity."

24.   When Dr. Macri informed Dr. Conner that his abusive behavior toward the female leaders was unacceptable, Dr. Conner did not speak to Dr. Macri for two weeks.

**B.**     **Dr. Conner Sets His Sights on Dr. Macri and Professes His "Love" for Her.**

25.   On January 8, 2018, Dr. Conner called Dr. Macri into his office, told her to shut the door, and instructed her to sit next to him. Dr. Macri was wary, as it was rare that she was called into his office alone.

26.   Dr. Conner told Dr. Macri that he could not stop thinking about her during the holiday break, and that he thought he was in love with her. He also attributed their disagreements about MPS-related issues to being like a married couple arguing about what they thought was best.

27.   Dr. Conner then told Dr. Macri that he hated that "all these women gave him attention" while Dr. Macri "didn't give him the time of day." Dr. Conner said that he had never met anyone who challenged him cognitively like Dr. Macri did and that they would be a great power couple.

28.   Dr. Conner made very clear why he was targeting Dr. Macri. He said, in substance: "I only do this" – that is, pursues a romantic or sexual relationship – "with women who have just as much to lose as I do."

29.   Dr. Macri immediately feared for her job and knew she needed to be cautious in her response. She politely reminded Dr. Conner that they both had significant others, that his behavior

5

was unprofessional, and that it was vital that they maintain a professional relationship.  Then she left his office.

30.   This was just the beginning of Dr. Conner's campaign to wield sexual power over Dr. Macri. From January through March of 2018, Dr. Conner frequently called Dr. Macri into his office when he was alone or schemed of other ways to interact with her in private. Dr. Macri resorted to literally tiptoeing around the hallway to avoid attracting Dr. Conner's attention.

31.   Dr. Conner repeatedly professed his sexual feelings for Dr. Macri and told her he was in love with her.  Each and every time, she redirected their conversations to work related issues, but Dr. Conner parried her attempts to change the subject by rationalizing that she just did not want to admit that she felt the same way about him.

32.   Thereafter, Dr. Macri avoided being alone with Dr. Conner whenever possible.  She shared Dr. Conner's behavior with her therapist in order to learn strategies to manage the harassment.

C.   **Dr. Macri Reports Dr. Conner's Harassment to Multiple MPS Officials. Her Complaints Fall on Deaf Ears.**

33.   Dr. Macri was not always able to avoid being alone with Dr. Conner.  On January 22, 2018, Dr. Conner instructed Dr. Macri to stay in his office after a group meeting. He pulled his chair close to Dr. Macri so their knees were touching and told her he was in love with her and could not stop thinking about her. Dr. Macri was extremely uncomfortable and left the room as soon as possible.

34.   After that meeting, Dr. Macri realized that she could not continue to manage Dr. Conner's increasingly abusive conduct on her own, and she reached out to MPS's Title IX Coordinator Marco Gaylord. Dr. Macri described to Mr. Gaylord Dr. Conner's conduct toward her, including the fact that Dr. Conner had told her repeatedly that he was in love with her.

6

35.   Dr. Macri informed Mr. Gaylord that she did not want him to escalate her concerns. Even though he was MPS's Title IX Coordinator, he did not encourage her to reconsider, nor did he investigate her complaint.

36.   By late February 2018, with Dr. Conner's fixation on Dr. Macri showing no signs of abating and her anxiety continuing to mount, Dr. Macri met with MPS's Director of Human Resources and described Dr. Conner's harassment of her.

37.   Dr. Macri shared with the HR Director that Dr. Conner had told her that he thought he was in love with her.  She also reported that Dr. Conner said that he "hates that all these women give him all this attention, and you [Dr. Macri] don't give me the time of day"; that Dr. Conner had "never met anyone that challenged me cognitively" and that "we would make a great power couple"; and that Dr. Conner only does this with "women that have as much to lose as [Dr. Conner does]."

38.   The HR Director advised Dr. Macri to file a complaint with Mr. Gaylord.  Dr. Macri said that she was fearful of Dr. Conner's power to destroy her career, particularly because of Dr. Conner's reference to how much she had to lose.

39.   The HR Director did not press Dr. Macri further.  Instead, she shared that she, too, felt uncomfortable with Dr. Conner, noting that he frequently stared at her legs. The HR Director stated that Dr. Conner repeatedly spoke with her about his previous girlfriends and relationships.

40.   Approximately one week later, in early March 2018, Dr. Macri again approached Title IX Coordinator Gaylord and reported everything that she had shared with the HR Director about Dr. Conner's harassment of her.

41.   Once again, Dr. Macri expressed her biggest fear:  If she filed a Title IX complaint against Dr. Conner, she said, she risked his sabotage of her career. Not only did Mr. Gaylord fail

to urge her to report Dr. Conner and advise her MPS would protect her if she did, but Mr. Gaylord <u>agreed</u> that it would be "career suicide" for Dr. Macri to report Dr. Conner's harassment.

42.   Once again Mr. Gaylord did not investigate Dr. Macri's complaint. Instead, the only action he took to protect Dr. Macri from Dr. Conner was to attend out of state conferences with her so that she would not have to be alone with him.

**D.    Dr. Conner's Sexualized Conduct Toward Dr. Macri Becomes Physical, and His Sexualized Comments Turn Obscene.**

43.   On May 17, 2018, Dr. Conner summoned Dr. Macri to his office. Dr. Conner asked Dr. Macri why she was sitting so far away from him.  He pushed his chair closer to her until their knees touched.  He then leaned forward towards Dr. Macri and put his outstretched hands on the arms of her chair, effectively trapping her in her seat. Dr. Macri tried to slide her chair away from him, but Dr. Conner told her to stop.

44.   Dr. Conner told Dr. Macri that he could not get her out of his head and said he wanted to divorce his wife because she wasn't right for him like Dr. Macri was. He said he did not connect with his wife like he did with Dr. Macri.

45.   Dr. Conner told Dr. Macri, in substance, that "the size of my penis would feel so good in you," and that "they do not make condoms the size to fit me."

46.   Dr. Conner then asked Dr. Macri if she was getting her own hotel room for an upcoming overnight conference and asked her to go with him a day early.

47.   Dr. Macri felt trapped and sickened. She wanted to leave the room, but again she feared the power Dr. Conner had over her and her job.  She reminded Dr. Conner that she worked for him, declined his invitation to pursue any type of a romantic relationship, and told him she would not go up early to the conference.

48.   Over the next few months, Dr. Conner continued to pursue Dr. Macri. He repeatedly lamented to her that so many women wanted him while she was the only one who would not give him any attention.

49.   On September 10, 2018, Dr. Conner engineered to have some time alone with Dr. Macri. He told her that he was thinking about leaving his wife so that he could be with Dr. Macri. He explained he was not in love with his wife and that his relationship with her was more akin to that of a sibling.

**E.**   **Dr. Conner Continues to Target Other Female Administrators; MPS's Title IX Coordinator Witnesses the Abuse but Does Nothing.**

50.   On November 15, 2018, Dr. Conner angrily screamed at two female administrators in front of Dr. Macri. He took a piece of paper, crumpled it up in one of the female principal's faces, and yelled at them, in substance, "Fine!  Do it your way!  But if those scores don't go up, you're going to have a big problem!"  As he yelled, spit from his mouth hit one of the female principals in the face.

51.   Title IX Coordinator Gaylord attended the meeting where this occurred, and he witnessed Dr. Conner's conduct.  He did nothing to stop it or to address it afterwards.

52.   Instead, it was Dr. Macri who told Dr. Conner that he should not speak to the female principal that way and said that he was creating an unhealthy and toxic work environment.  Dr. Macri was so upset that she started to shake, at which point she left the meeting.

53.   Dr. Macri immediately walked into the HR Director's office, told her about Dr. Conner's conduct, said that she could not endure his abuse any longer, and asked about the possibility of taking FMLA leave. Dr. Macri was so distraught over Dr. Conner's harassment and abuse that she felt physically ill.

### F.    Dr. Conner Is Undeterred by Dr. Macri's Rejections; Dr. Macri Reiterates Her Pleas for Help.

54.   Within an hour, Dr. Conner summoned Dr. Macri to a conference room. She did not want to be alone with Dr. Conner, particularly after his latest outburst, so when she entered the conference room, she stood by the door, ready to make a quick exit if needed.

55.   Dr. Conner instructed her to sit down. Dr. Macri said she was not feeling well after the events of their recent meeting and that it was best if they waited until later to talk.

56.   Dr. Conner was still enraged. He demanded once again that Dr. Macri sit down and complained that he did not like her comments about an "unhealthy and toxic work environment." Dr. Macri replied that the environment was in fact unhealthy and that his behavior was scary.

57.   Dr. Conner then once again redirected the conversation to his feelings for Dr. Macri. He again likened their relationship to marriage. He said they were going to have big blow-ups but that it would be good when they made-up.  Disgusted, Dr. Macri told Dr. Conner that he was out of line.  She reiterated that she was not married to him and that they had a professional relationship only.

58.   Dr. Conner told Dr. Macri he agreed with her and then told her how beautiful and smart she was and how lucky he was to work with her.

59.   Shortly thereafter, Dr. Macri returned to Human Resources and asked again about FMLA leave.

60.   During that meeting with the HR Director, Dr. Macri reported Dr. Conner's most recent acts of sexual harassment, including his statements that he wanted to divorce his wife and his graphic descriptions of his genitals.

61.   Dr. Macri told the HR Director that she was hesitant to file a sexual harassment claim because she was afraid of Dr. Conner.  She said she feared that he was mentally unstable and that, if she reported him, he would ensure she lost her job.

62.   Dr. Macri also informed the HR Director that she had already spoken to Title IX Coordinator Gaylord about Dr. Conner's sexual harassment of her but had not filed a formal complaint.

63.   The HR Director told Dr. Macri that she would contact MPS's outside legal counsel to ask for advice about how best to address Dr. Conner's misconduct.

64.   The following day, the HR Director told Dr. Macri that she had discussed the situation with counsel and was told that, if Dr. Macri did not want to file a Title IX complaint, nothing could be done other than to implement sexual harassment training.

65.   Dr. Macri continued to escalate her complaints about Dr. Conner within MPS. In or around November 2018, the HR Director and Dr. Macri reported Dr. Conner's sexual harassment and discrimination of her, the HR Director, and other female administrators to Chris Drake, the Chairman of the Middletown Board of Education.

66.   Mr. Drake said he could not do anything unless someone made a complaint in writing.

67.   Throughout early 2019, Dr. Macri and the HR Director, both individually and together, had several similar conversations with Mr. Drake. In each conversation, Dr. Macri described her fear that Dr. Conner would retaliate against her and she would lose her job.

68.   MPS took no action to investigate or address the concerns articulated by Dr. Macri or the HR Director.

69.   Desperate for help, in fall 2018, Dr. Macri contacted Sean King, another member of the Middletown Board of Education, to report Dr. Conner's sexual harassment, sex discrimination,

and abuse. Like Mr. Drake, Mr. King also said that there was nothing he could do unless she was willing to complain in writing.

    **G.**    **MPS's Repeated Failures to Stop Dr. Conner Empower Him to Sexually Assault Dr. Macri.**

    70.    From November of 2018 through January of 2019, Dr. Conner continued to harass Dr. Macri. He would engineer ways for them to be alone and would tell her that he wanted to be with her, that he was divorcing his wife, and that he was crazy about her, and he would question why she didn't pay attention to him.  On some of those occasions, Dr. Conner would pull his chair close to Dr. Macri in a manner that physically intimidated her.

    71.    During this time, Dr. Macri continued to witness Dr. Conner harass female administrators. Dr. Conner berated them if their assessment results dropped, if they asked questions that caused him to believe they were not "on board" with his constantly changing initiatives, or if he felt they were not "on his team."  Dr. Macri attempted to talk to Dr. Conner about his behavior towards the female administrators but found it impossible to reason with him.

    72.    Dr. Conner's abusive conduct toward Dr. Macri became more frequent and more intense.  He entered her office without permission or notice multiple times a day, making unwelcome and frequently incoherent comments to her.

    73.    For example, on one occasion, Dr. Conner told Dr. Macri that he received a phone call from someone telling him he had an IQ of 191.  He changed the number to 189, and then to 192. Macri asked who called him with this information, and Dr. Conner replied that it was "someone important." Dr. Conner asked Dr. Macri if she thought he was weird because he was so smart and people could not relate to him.

74.   On January 15, 2019, Dr. Macri again called Board of Education chair Chris Drake and reported Dr. Conner's harassment. Once again, he refused to help her unless she would make a complaint in writing.

75.   On January 17, 2019, Dr. Macri again contacted Board of Education member Sean King about Dr. Conner's harassing and abusive behavior. Mr. King again told her that, in substance, "until someone puts something in writing, there is nothing illegal about a boss that is a jerk or a bad person." He did not tell her what measures MPS would take to protect her both personally and professionally if she were to file a formal written complaint.

76.   On February 5, 2019, Dr. Conner summoned Dr. Macri to his office to join him in a call to DCF regarding a student. Such calls were usually made in the conference room, which has glass walls, but Dr. Conner arranged for Dr. Macri to meet him in his small office with the blinds drawn.

77.   After they called DCF, Dr. Macri got up to leave the room. Dr. Conner immediately rose, put his body between her and the door, and held the door shut. While blocking her from leaving the room, Dr. Conner told Dr. Macri that he wanted to kiss her and that he knew she wanted to kiss him too.

78.   Dr. Macri told Dr. Conner she wanted to leave the room. He replied she could leave if she gave him one kiss. Dr. Macri pushed past him and tried to open the door. As she did so, Dr. Conner leaned in to kiss her. Dr. Macri turned her face quickly and Dr. Conner's lips landed on her cheek, very close to her lips. Disgusted and terrified, Dr. Macri pulled the door open and rushed out of the room.

79.   The next day, Dr. Macri's administrative assistant informed Dr. Macri that Dr. Conner had entered Dr. Macri's office area and paced by her desk at least ten times. The assistant reported

that Dr. Conner was "acting nuts" and repeatedly asked "where is she?" as he circled in and around Dr. Macri's office.

80.    Immediately after Dr. Macri returned to her office, Dr. Conner followed her in and slammed the door behind him. He sat at her conference table in the seat closest to her. He said he was very stressed out and started rubbing his head. Dr. Macri saw that he was perspiring profusely. She asked Dr. Conner if he was okay and, in an effort to deflect the strangeness of his behavior, said it was a "stressful time of year."

81.    Dr. Conner responded that this was "different stress" that caused him to experience white bumps around the back of his neck. Dr. Macri asked him if he had seen a doctor. He replied, in substance: "No, it's not like that. This happens to me when I feel very close to a woman, and I feel something sensual for her, and she has her period."

82.    Dr. Macri then realized that, while she was away from her office, she had left her open pocketbook with tampons visible on the chair next to her desk. Dr. Macri was petrified. Fortunately, her administrative assistant, who was concerned about Dr. Conner's obsessive behavior, knocked on Dr. Macri's door and informed her that her next appointment had arrived. As soon as Dr. Conner left the room, Dr. Macri started to cry.

83.    Thereafter, Dr. Macri informed Title IX Coordinator Gaylord of Dr. Conner's conduct in blocking her egress and kissing her against her will and his comments about being aroused around women (like her) who had their period.  Title IX Coordinator Gaylord again took no action.

**H.    Dr. Conner and MPS Retaliate Against Dr. Macri for Complaining about Dr. Conner's Sexual Harassment and Assault of Her.**

84.    Shortly after she reported to Mr. Gaylord Dr. Conner's most recent acts of graphic sexual harassment and outright sexual assault, Dr. Macri noticed a marked shift in the way Mr. Gaylord treated her.  For example, in February 2019, Mr. Gaylord drove Dr. Conner to the airport

for a conference that they were attending. Mr. Gaylord spent most of his time at the conference with Dr. Conner and very little time with Dr. Macri. In the past, Mr. Gaylord would offer to drive Dr. Macri to the airport for such events and spent significant time with her during them. Before her most recent reports of Dr. Conner's conduct, Mr. Gaylord sought Dr. Macri out to ensure she was ok.  Thereafter, he avoided Dr. Macri.  He no longer checked on her and began spending more and more time with Dr. Conner.

85.   Upon information and belief, Dr. Conner knew in late February or early March of 2019 that Dr. Macri had reported his sexual harassment and assault of her to others. Thereafter, Dr. Conner began to engage in a campaign to isolate Dr. Macri and undermine her authority.

86.   Dr. Conner would schedule meetings with Dr. Macri's curriculum team without her knowledge, would not invite her to the meetings she normally attended, and would make decisions in which she would otherwise be involved without her input. For example, before he became aware of Dr. Macri's complaints, Dr. Conner would consult Dr. Macri about changes he wanted to be made to curriculum/resources, because that was her department. After he learned of her complaints, Dr. Conner abandoned the pilot roll-out program at Woodrow Wilson Middle School (recently renamed Beamon Middle School) and instead made sudden, permanent changes without Dr. Macri's knowledge or input.

87.   Dr. Conner stopped attending Administrative Council meetings, which were normally led by Dr. Conner and Dr. Macri together.  This left Dr. Macri to run the meetings on her own. Thereafter he would criticize the manner in which she ran them.

88.   Upon information and belief, Dr. Conner began disparaging Dr. Macri to administrators both inside and outside the district. On several occasions, administrators reported to Dr. Macri that Dr. Conner referred to her as a racist.

89.   Dr. Macri heard more than once Dr. Conner ask people whether they were on "his team" or "Dr. Macri's team."

90.   Dr. Conner had created a fiefdom at MPS in which only those who served him survived and Dr. Marci had no place. It was clear that under his rule she could no longer be a force for good in the community she loved and to which she had devoted her career. And so, she did what just a short time ago would have been unthinkable:  she left her second family and found another job.

91.   Dr. Macri accepted an offer to serve as Superintendent of Cromwell Public Schools and has served in that role since August 1, 2019. Nonetheless, both during and after her employment with Middletown Public Schools, the Defendants' conduct has caused her substantial non-economic damages.

## V.   LEGAL CLAIMS

**COUNT ONE:**
**HOSTILE WORK ENVIRONMENT, IN VIOLATION OF TITLE IX**
**OF THE EDUCATION AMENDMENTS OF 1972, 20 U.S.C. § 1681,**
**AGAINST MIDDLETOWN BOARD OF EDUCATION**

92.   The plaintiff incorporates by reference all preceding allegations in this Complaint.

93.   The plaintiff sustained harassment because of her sex that was sufficiently severe or pervasive to alter the terms or conditions of her employment and create a hostile working environment.

94.   All acts that constituted and contributed to the hostile working environment were part of the same unlawful practice, and one or more acts contributing to the hostile working environment occurred within the statutory limitations period.

95.   The Middletown Board of Education had actual knowledge of the harassment sustained by the plaintiff and other female employees of the Middletown Board of Education.

96.   The harassment occurred in a context that was subject to the Middletown Board of Education's' control and where the Middletown Board of Education could have taken remedial action.

97.   The Middletown Board of Education acted with deliberate indifference insofar as one or more officials at the Middletown Board of Education with authority to address the sex discrimination against the plaintiff and to institute corrective measures had actual knowledge of the discrimination and failed to respond and/or responded in a clearly unreasonable fashion in light of the known circumstances.  Specifically, the official or officials did not take actions that were reasonably calculated to end the discrimination.

98.   As a result of the Middletown Board of Education's' deliberate indifference and failure to respond to plaintiff's harassment, the plaintiff suffered damages.

**COUNT TWO:**
**RETALIATION, IN VIOLATION OF TITLE IX**
**OF THE EDUCATION AMENDMENTS OF 1972, 20 U.S.C. § 1681,**
**AGAINST MIDDLETOWN BOARD OF EDUCATION**

99.   The plaintiff incorporates by reference all preceding allegations in this Complaint.

100. The plaintiff engaged in protected activity within the meaning of Title IX.

101.  The Middletown Board of Education retaliated against the plaintiff because of her protected activity.

102.  The retaliation by the Middletown Board of Education continued and amplified the hostile work environment to which Middletown Board of Education had been subjecting the plaintiff on the basis of her sex, insofar as it constituted part of a pattern of ongoing hostility and animus toward the plaintiff on that basis.

103.  The retaliation by the Middletown Board of Education might well have dissuaded a reasonable person in the plaintiff's position from making a charge of discrimination.

104.  As a result of the Middletown Board of Education's retaliation, the plaintiff suffered damages.

## COUNT THREE:
## FAILURE TO SUPERVISE AGAINST MIDDLETOWN BOARD OF EDUCATION PURSUANT TO 42 U.S.C. § 1983

105.  The plaintiff incorporates by reference all preceding allegations in this Complaint.

106.  The plaintiff's workplace at the Middletown Board of Education was permeated with discrimination on the basis of sex that was sufficiently severe or pervasive to alter the terms or conditions of her employment and create a hostile working environment.

107.  The hostile work environment was sufficiently severe to deprive Dr. Macri of her rights under the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution.

108.  The infliction on Dr. Macri of this constitutional injury was the result of a municipal policy or custom, in that policymaking officials of the Middletown Board of Education exhibited deliberate indifference to the constitutional deprivations caused by its subordinate, Dr. Michael Conner.

109.  The Middletown Board of Education's failure to act, despite actual knowledge of Dr. Conner's harassment of Dr. Macri, constituted a deliberate choice and was part of the district's policy, custom, and/or practice.

110.  Further, Dr. Conner was a final policy making official and his conduct is attributable to the Middletown Board of Education.

111.  As a result of the Middletown Board of Education's conduct, the plaintiff suffered damages.

**COUNT FOUR:**
**HOSTILE WORK ENVIRONMENT, IN VIOLATION OF TITLE IX**
**OF THE EDUCATION AMENDMENTS OF 1972, 20 U.S.C. § 1681,**
**AGAINST CITY OF MIDDLETOWN**

112.  The plaintiff incorporates by reference all preceding allegations in this Complaint.

113.  The plaintiff sustained harassment because of her sex that was sufficiently severe or pervasive to alter the terms or conditions of her employment and create a hostile working environment.

114.  All acts that constituted and contributed to the hostile working environment were part of the same unlawful practice, and one or more acts contributing to the hostile working environment occurred within the statutory limitations period.

115.  The City of Middletown had actual knowledge of the harassment sustained by the plaintiff and other female employees the City of Middletown.

116.  The harassment occurred in a context that was subject to the City of Middletown's control and where the City of Middletown could have taken remedial action.

117.  The City of Middletown acted with deliberate indifference insofar as one or more officials at the City of Middletown with authority to address the sex discrimination against the plaintiff and to institute corrective measures had actual knowledge of the discrimination and failed to respond and/or responded in a clearly unreasonable fashion in light of the known circumstances. Specifically, the official or officials did not take actions that were reasonably calculated to end the discrimination.

118.   As a result of the City of Middletown's deliberate indifference and failure to respond to plaintiff's harassment, the plaintiff suffered damages.

## COUNT FIVE:
## RETALIATION, IN VIOLATION OF TITLE IX
## OF THE EDUCATION AMENDMENTS OF 1972, 20 U.S.C. § 1681,
## AGAINST CITY OF MIDDLETOWN

119.   The plaintiff incorporates by reference all preceding allegations in this Complaint.

120.   The plaintiff engaged in protected activity within the meaning of Title IX.

121.   The City of Middletown retaliated against the plaintiff because of her protected activity.

122.   The retaliation by the City of Middletown continued and amplified the hostile work environment to which the City of Middletown had been subjecting the plaintiff on the basis of her sex, insofar as it constituted part of a pattern of ongoing hostility and animus toward the plaintiff on that basis.

123.   The retaliation by the City of Middletown might well have dissuaded a reasonable person in the plaintiff's position from making a charge of discrimination.

124.   As a result of the City of Middletown's retaliation, the plaintiff suffered damages.

## COUNT SIX:
## FAILURE TO SUPERVISE AGAINST CITY OF MIDDLETOWN
## PURSUANT TO 42 U.S.C. § 1983

125.   The plaintiff incorporates by reference all preceding allegations in this Complaint.

126.   The plaintiff's workplace at the City of Middletown was permeated with discrimination on the basis of sex that was sufficiently severe or pervasive to alter the terms or conditions of her employment and create a hostile working environment.

127.  The hostile work environment was sufficiently severe to deprive Dr. Macri of her rights under the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution.

128.  The infliction on Dr. Macri of this constitutional injury was the result of a municipal policy or custom, in that policymaking officials of the City of Middletown exhibited deliberate indifference to the constitutional deprivations caused by its subordinate, Dr. Michael Conner.

129.  The City of Middletown's failure to act, despite actual knowledge of Dr. Conner's harassment of Dr. Macri, constituted a deliberate choice and was part of the district's policy, custom, and/or practice.

130.  Further, Dr. Conner was a final policy making official and his conduct is attributable to the City of Middletown.

131.  As a result of the City of Middletown's conduct, the plaintiff suffered damages.

**COUNT SEVEN:**
**AGAINST DR. MICHAEL CONNER IN HIS INDIVIDUAL CAPACITY:**
**VIOLATION OF THE EQUAL PROTECTION CLAUSE**
**PURSUANT TO 42 U.S.C. § 1983**

131.  The plaintiff incorporates by reference all preceding allegations in this Complaint.

132.  At all relevant times, Dr. Michael Conner was acting under color of state law to deprive Dr. Macri of her rights under the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution.

133.  At all relevant times, Dr. Michael Conner was engaged in intentional harassment of Dr. Macri based on her sex, which rose to the level of purposeful discrimination on the basis of her sex.

134.   Dr. Michael Conner's actions caused the plaintiff's workplace at Middletown Public Schools to be permeated with discrimination on the basis of sex that was sufficiently severe or pervasive to alter the terms or conditions of her employment and create a hostile working environment.

135.   Dr. Macri subjectively perceived that the working environment was abusive.

136.   As a result of Dr. Conner's conduct, the plaintiff suffered damages.

## COUNT EIGHT:
### INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS, AGAINST DR. MICHAEL CONNER, IN HIS INDIVIDUAL CAPACITY

137.   The plaintiff incorporates by reference all preceding allegations in this Complaint.

138.   Dr. Michael Conner intended to inflict emotional distress on Dr. Macri; and/or he knew or should have known that emotional distress was the likely result of his conduct.

139.   Dr. Conner's conduct in harassing Dr. Macri was extreme and outrageous.

140.   Dr. Conner's conduct in harassing Dr. Macri was the cause of Dr. Macri's emotional distress.

141.   The emotional distress sustained by Dr. Macri was severe.

142.   As a result of Dr. Conner's conduct, the plaintiff suffered damages.

## COUNT NINE:
### NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS, AGAINST DR. MICHAEL CONNER, IN HIS INDIVIDUAL CAPACITY

143.   The plaintiff incorporates by reference all preceding allegations in this Complaint.

144.   Dr. Michael Conner's conduct created an unreasonable risk of causing Dr. Macri emotional distress.

145.   Dr. Macri's emotional distress was foreseeable.

146. Dr. Conner's conduct in harassing Dr. Macri was severe enough that it might result in illness or bodily harm and was committed in the context of his constructive discharge of Dr. Macri from her employment with MPS.

147. Dr. Conner's conduct in harassing Dr. Macri was the cause of Dr. Macri's emotional distress.

148. As a result of Dr. Conner's conduct, the plaintiff suffered damages.

## COUNT TEN:
### ASSAULT AGAINST DR. MICHAEL CONNER, IN HIS INDIVIDUAL CAPACITY

149. The plaintiff incorporates by reference all preceding allegations in this Complaint.

150. Dr. Conner's actions intentionally caused Dr. Macri to suffer imminent apprehension of harmful or offensive contact.

151. As a result of Dr. Conner's conduct, the plaintiff suffered damages.

## COUNT ELEVEN:
### BATTERY AGAINST DR. MICHAEL CONNER, IN HIS INDIVIDUAL CAPACITY

152. The plaintiff incorporates by reference all preceding allegations in this Complaint.

153. Dr. Conner acted intending to cause a harmful or offensive contact with Dr. Macri.

154. Dr. Conner's actions did in fact cause a harmful contact with Dr. Macri.

155. As a result of Dr. Conner's conduct, the plaintiff suffered damages.

\* \* \*

**WHEREFORE**, the plaintiff respectfully prays that this Court award the following damages, jointly and severally, from each defendant:

    a.   Economic damages;

    b.   Compensatory damages;

    c.   Declaration that the defendants' practices violated Title IX;

    d.   Punitive damages pursuant to 42 U.S.C. Section 1983;

    e.   Injunctive relief, including that the defendants be enjoined and permanently restrained from continuing to engage in unlawful employment practices, and that the defendants be directed to take affirmative action as is necessary to ensure the unlawful employment practices are eliminated;

    f.   Punitive damages for the defendants' willful and/or recklessly indifferent conduct;

    g.   Attorneys' fees and costs; and

    h.   Any other remedy that may appear to be just and proper.

**RESPECTFULLY SUBMITTED,**
**THE PLAINTIFF**

By:    /s/ *Nina T. Pirrotti*

Nina T. Pirrotti (*ct26792*)
Joshua R. Goodbaum *(ct28834)*
Betsy Ingraham *(ct27820)*
GARRISON, LEVIN-EPSTEIN,
    FITZGERALD & PIRROTTI, P.C.
405 Orange Street
New Haven, CT 06511
Tel.: (203) 777-4425 | Fax: (203) 776-3965
npirrotti@garrisonlaw.com
jgoodbaum@garrisonlaw.com
bingraham@garrisonlaw.com

HER COUNSEL

**PLEASE ENTER OUR APPEARANCES AS COUNSEL FOR THE PLAINTIFF**